Filed 7/9/26  P. v. Martinez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>JORGE SANCHEZ MARTINEZ,<br><br>  Defendant and Appellant. | H052755<br>(Santa Clara County<br>Super. Ct. No. C1915159) |

In 2024, a jury found defendant Jorge Sanchez Martinez guilty of multiple counts stemming from numerous acts of sexual abuse against his daughter, G. Doe,[1] and his cousin, D. Doe.  The trial court sentenced Martinez to a total indeterminate term of 150 years to life in prison, with an additional determinate term of five years in prison.

On appeal, Martinez claims that the trial court committed instructional error and impermissibly lowered the prosecution's burden of proof by instructing the jury that it could consider G. Doe's prior statements regarding the alleged sexual abuse for certain limited purposes.  Martinez further argues that the trial court committed sentencing error by imposing full, separate, consecutive sentences for his offenses against G. Doe and limiting his presentencing custody credits to the offense against D. Doe only.

For the reasons explained below, we affirm.

---

[1] We refer to the victims in this matter by their first initial and last name "Doe" to protect their confidentiality pursuant to California Rules of Court, rule 8.90(b)(4).

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. *Charges*, *Trial*, *and Sentencing*

On February 26, 2020, the Santa Clara County District Attorney's Office filed an information charging Martinez with six counts of aggravated sexual assault (rape) against G. Doe, a child under the age of 14 and more than 10 years younger than Martinez (Pen. Code[2], § 269, subd. (a)(1); counts 1–6); two counts of aggravated sexual assault (oral copulation) against G. Doe, a child under the age of 14 and more than 10 years younger than Martinez (§ 269, subd. (a)(4); counts 7–8); two counts of aggravated sexual assault (sexual penetration) against G. Doe, a child under the age of 14 and more than 10 years younger than Martinez (§ 269, subd. (a)(5); counts 9–10); and one count of assault with intent to commit an enumerated felony against D. Doe, a person under the age of 18 (§ 220, subd. (a)(2); count 11).

Following a multi-day trial, on August 6, 2024, the jury found Martinez guilty on all 11 counts.

On November 8, 2024, the trial court sentenced Martinez to the following: (1) six consecutive indeterminate terms of 15 years to life in prison on counts 1 through 6 (§ 269, subd. (a)(1)); (2) two consecutive indeterminate terms of 15 years to life in prison on counts 7 and 8 (§ 269, subd. (a)(4)); (3) two consecutive indeterminate terms of 15 years to life in prison on counts 9 and 10 (§ 269, subd. (a)(5)); and (4) a consecutive determinate lower term of five years in prison on count 11 (§ 220, subd. (a)(2)). Martinez's aggregate sentence was for an indeterminate term of 150 years in prison, with an additional determinate term of five years in prison. The trial court awarded Martinez 1,901 days of actual credit and 285 days of local conduct credit pursuant to section 2933.1, which were applied to count 11 only.

Martinez timely appealed.

---

[2] Undesignated statutory references are to the Penal Code.

## B. Factual Background

### 1. Prosecution's Case

#### a. Offenses against D. Doe (count 11)

D. Doe, who was 24 years old at the time of trial, testified that Martinez[3] was her cousin and was approximately 20 years older than her. D. Doe indicated that because her extended family, including Martinez, lived in one household for a long period of time, she was very close to Martinez and saw him daily during elementary school. While she and Martinez were no longer living in the same household by the time she was in high school, she still saw him on a regular basis at family events.

D. Doe testified that during the fall of her freshman year in high school, when she was approximately 13 or 14 years old, she had gone to Martinez's brother's home with her family to borrow the brother's truck. D. Doe's parents left, and Martinez was left in charge of D. Doe, her two younger brothers, and her three younger cousins. While the other children were watching a movie in the living room, Martinez called D. Doe into his room and asked her to watch a movie with him. When D. Doe entered the room, Martinez was lying down on the bed and asked her to lie down next to him. Martinez then asked D. Doe to move closer to him, and began showing D. Doe photos on his phone of girls, who were wearing what D. Doe described as "minimal clothes"; Martinez also made comments about the girls' bodies. As Martinez was making the comments, D. Doe "froze" and was unable to think or move, even though she felt she should.

Martinez told D. Doe that if she wanted to have a "pretty body type[]" like the girls in the pictures, she needed to have sexual intercourse. Martinez then began touching D. Doe over her breasts and started kissing her. Martinez subsequently moved his hand down over her stomach and thighs, and put his hand in between her legs. The kissing and

---

[3] Most of the witnesses, including D. Doe, referred to Martinez as Eric Hernandez, which defense counsel indicated was Martinez's "true name" at the outset of trial.

touching went on for approximately five to 10 minutes. During this time, D. Doe felt "stuck" and unable to move, as she did not expect anything like this to happen. However, she was ultimately able to shake her head to say "no" when Martinez asked if she wanted him to continue further. Martinez then told D. Doe she could get up and leave, but to not to tell anyone about what happened. D. Doe immediately went to the bathroom and tried to wait there until her parents came back, but ultimately came back out to sit in the living room, while Martinez remained in his room.

D. Doe was initially too scared to tell anyone about what happened because she was afraid Martinez might physically hurt her, based on her previous observations of him getting very aggravated and "intense" while drinking and his significantly bigger size. She also believed that Martinez was involved in gang activity. However, a few days later, D. Doe told two of her cousins over the phone that Martinez had touched her inappropriately. Both cousins told her they would talk to her more about the incident in person, but never did. D. Doe finally told her parents a few years later after being encouraged to do so by her friends. After D. Doe disclosed the incident to her parents and reported it to the police, most of her extended family cut off communication with her, and certain family members began pressuring her to "remove" the allegations against Martinez.

### b. Offenses against G. Doe (counts 1–10)

#### i. G. Doe's Testimony and Prior Statements

G. Doe, who was 17 years old at the time of trial, testified that Martinez, her father, gained custody of her while she was in elementary school after he discovered she had been living in foster care. G. Doe initially lived with Martinez and his then-girlfriend, K. Doe[4], at K. Doe's home. G. Doe stated that she never developed a strong

---

[4] We refer to Martinez's girlfriend as K. Doe based on her testimony, as described in detail below, regarding her past sexual relationship with Martinez, which began when she was under the age of 18.

father-daughter relationship with Martinez, as they did not talk much and she did not feel like opening up to him. However, they frequently got into arguments, and if G. Doe did not listen, Martinez would hit her with his hand, belt, or sandal. G. Doe estimated that Martinez hit her at least twice a week while she was living with him, causing her to become afraid of him.

In 2017, when G. Doe was approximately 10 years old, she spoke with a police officer and told him that Martinez made her get on her knees, then hit her on her leg and hand with an iPhone charger cable because she made mistakes while learning her multiplication tables. She also told the police officer that Martinez had been hitting her daily with multiple objects, including a hanger, a seatbelt, his belt, and his sandal. After G. Doe spoke with the police, she recalled that officers came to speak with Martinez and gave him a warning, but did not take any further action. Martinez subsequently sent her to Las Vegas to live with her aunt for a year. G. Doe became afraid to say anything else regarding Martinez's behavior because she was concerned that if he were arrested, she would be left with no place to live and would have to go back into foster care.

In the summer of 2018, G. Doe chose to return to California and live with Martinez. Although their relationship improved for some time, G. Doe and Martinez continued to have arguments. When G. Doe was approximately 12 and started dating, Martinez became angry with her and told her she could no longer talk to her boyfriend, then hit her on her arm. G. Doe subsequently stopped dating her boyfriend because she was afraid to disobey Martinez and wanted to maintain the improved relationship between them.

After her return to California, G. Doe moved between relatives' homes and was not regularly staying with Martinez, who had since broken up with K. Doe. In 2019,

while G. Doe was 12 years old and staying with her aunt C.R.,[5] she decided she did not want to move anymore and wanted to live permanently with C.R.  When G. Doe told C.R. that she was scared to go back home with Martinez, C.R. asked if Martinez had ever touched her (G. Doe) inappropriately, and G. Doe confirmed that he had.  The following day, C.R. took G. Doe to the police.

During G. Doe's first interview with the police, which took place on June 18, 2019, she told Detective Kelly Stenger that she had been touched in her "private things" by Martinez and did not like it.  G. Doe told Stenger that a few months prior, when she was asleep at K. Doe's home, Martinez came into her room at 3:00 a.m. and began touching her under her clothing in her chest area and between her legs.  Martinez then took off his clothes and put his "private spot" inside G. Doe's "private spot." [6] Afterwards, G. Doe's stomach began hurting, and she was unable to use the bathroom due to the pain.

G. Doe told Detective Stenger that Martinez sexually assaulted her in a similar manner approximately eight to 10 times.  G. Doe additionally saw something that was "yellowish white" come out of Martinez's private part onto the bed.  Martinez also attempted to have her touch his penis during some of the assaults, but G. Doe would refuse or "fake cry" to make him stop.  The most recent occasion took place while she and Martinez were staying at the Milpitas-Calaveras hotel, when Martinez asked if he could touch her because it was Father's Day, but she refused.

G. Doe was subsequently interviewed on the same day in Spanish by Detective Tony Vera.  G. Doe told Vera that Martinez had been touching her inappropriately for the

[5] We refer to the civilian witnesses by their initials to protect their confidentiality pursuant to California Rules of Court, rule 8.90(b)(9) and (11).

[6] During her interview, G. Doe was provided a diagram of the female body, and marked areas on the chest and between the legs in the diagram as the places where Martinez had touched her.  G. Doe was also provided a diagram of the male body, and marked Martinez's "private spot" as an area between the male's legs.

6

past few months since she had returned from living in Las Vegas with her aunt. G. Doe again stated that the first incident had occurred around 3:00 a.m. one morning when Martinez had put his "private thing" inside of her. G. Doe stated that she was initially asleep when Martinez first began touching her inside her shirt, then woke up once he "put his thing" inside of her. G. Doe told Detective Vera that Martinez sexually assaulted her approximately five times while she was still living at K. Doe's house, which included him touching her chest with his hands and penetrating her vagina with his penis. On some of these occasions, Martinez also used his fingers to penetrate her vagina.

G. Doe stated that after Martinez broke up with K. Doe, she (G. Doe) and Martinez began staying in two different hotels in Milpitas and Gilroy. G. Doe stated that Martinez sexually assaulted her at least five times at the Milpitas hotel and approximately six or seven times at the Gilroy hotel, in a manner similar to the previous incidents at K. Doe's home. At both hotels, Martinez also used his mouth to lick G. Doe's vagina.

At trial, G. Doe recanted her prior statements regarding the assault. G. Doe testified that approximately one week after she told C.R. about the sexual assault, she informed C.R. that she had been lying. G. Doe stated that she and Martinez had fought, and Martinez had told her she was not his daughter, which made her feel very hurt. G. Doe then went to stay with C.R. and decided to lie that she had been assaulted because she wanted to "get away" from Martinez.[7] G. Doe also testified that the details she described about the abuse were taken from television shows she watched that involved sexual acts, as well as from a friend who had confided in G. Doe that she had been raped. G. Doe stated that she did not remember what she told the two detectives about Martinez

---

[7] G. Doe additionally stated that she had previously testified that she had only told C.R. that she was lying one day before the preliminary hearing, and that she had not mentioned the fight between her and Martinez in prior statements or testimony before trial. G. Doe further confirmed, after having her recollection refreshed, that she had previously testified that she had lied about Martinez sexually assaulting her because she felt Martinez paid more attention to her little brother than her.

7

sexually assaulting her, including specific details about the incidents, and testified that the information she had given them was not true.

### ii. Testimony of C.R.

C.R., Martinez's aunt, testified that G. Doe had been in her custody since G. Doe made her report to the police in 2019. Before C.R. took custody of G. Doe, she was concerned about G. Doe's wellbeing while in Martinez's care, as Martinez frequently moved G. Doe from home to home, and C.R.'s home was the only place where G. Doe felt like she had a family. C.R. stated that on the day G. Doe revealed the alleged assault to her, G. Doe was crying and told C.R. she did "not have a life" because she was going from home to home and Martinez was touching her. Prior to this, C.R. did not suspect that Martinez had been behaving inappropriately with G. Doe. However, once G. Doe told her about the alleged assault, C.R. "got in a real bad way" because her daughter was the same age as G. Doe. C.R. assured G. Doe that she would support her, and that G. Doe should tell the truth regardless of what it was.

C.R. spoke with the police on the same day that she brought G. Doe in to report the assault. At that time, C.R. told one of the detectives that G. Doe had stated Martinez had opened her legs, sucked her breasts, and placed his mouth on her vagina. G. Doe also told C.R. that Martinez had penetrated her with his penis, which hurt a lot and made G. Doe cry. G. Doe additionally told C.R. that Martinez had assaulted her on multiple occasions, including at home, at a hotel in Gilroy, in Martinez's van, at a park, and on camping and fishing trips when K. Doe was not present. In addition, G. Doe told C.R. that on Father's Day, Martinez wanted to touch her and G. Doe refused, leading to Martinez getting upset and threatening to send G. Doe away to Mexico to live with her grandmother.

C.R. testified that she emphasized to G. Doe numerous times how serious the allegations were and how important it was for G. Doe to tell the truth. At the time, G.

Doe maintained that the allegations were true, and after consulting with other family members, C.R. decided to have G. Doe report them to the police.

C.R. testified that some family members, including Martinez's mother, blamed her for getting Martinez in trouble. She also told a victim advocate from the District Attorney's office that she felt conflicted because of the blame and backlash she was receiving. C.R. confirmed that two days prior to Martinez having a scheduled court appearance, G. Doe told C.R. she felt "very badly" and had lied about the allegations.

### iii.    Testimony of H.G.

H.G., Martinez's uncle, testified that in 2019, G. Doe would occasionally spend the night at his home. On these occasions, Martinez would pick G. Doe up late at night, which H.G. did not approve of, and H.G. confronted Martinez about his behavior. H.G. testified that C.R. had come over with G. Doe one night in June 2019 and asked H.G. to come with her to the police department the following day to make a statement. At that time, G. Doe revealed to H.G. that Martinez had been touching her inappropriately. G. Doe told H.G. that Martinez had touched her "parts," referring to her breast and vagina, and that he had penetrated her with his "organ," which referred to Martinez's penis. G. Doe told H.G. that the penetration hurt and she did not like it.

When C.R. told him she planned to go to the police, H.G. agreed and accompanied them there, and spoke to the police. During his police interview, H.G. stated that G. Doe had told him that on one occasion when Martinez was touching her inappropriately, K. Doe saw what was happening and became upset with Martinez. G. Doe also reported to H.G. that the abuse took place many times, including in Martinez's van and while they were fishing.

### iv.    Testimony of E.L.

E.L., G. Doe's maternal grandmother, testified that she saw G. Doe often as a baby, but did not see her very much after G. Doe was taken away from E.L.'s daughter (G. Doe's mother). E.L. stated that G. Doe and C.R. came to visit her shortly after C.R.

9

discovered the alleged abuse, and G. Doe told E.L. that Martinez had touched her inappropriately in the past. When E.L. asked G. Doe why she had not said anything before, G. Doe said she was afraid that Martinez would be taken to jail, and she would be left alone with nowhere to stay. G. Doe also told E.L. that Martinez had threatened to leave her (G. Doe) "on the streets" in Oakland, and that no one loved her. E.L. stated that G. Doe later told her she had lied about the alleged abuse because she no longer wanted to live with Martinez.

### v. Testimony of Detective Vera

Detective Vera of the San Jose Police Department testified that in 2019, he and Detective Stenger were working together in the sexual assaults unit and had both interviewed G. Doe. Vera personally observed Stenger's interview with G. Doe as it was taking place, including Stenger's use of the diagrams of the female and male bodies—known as gingerbread sketches. Vera confirmed that when Stenger asked G. Doe about her private place, G. Doe circled her vaginal area on the female body diagram. G. Doe had also circled the penis area on the male body diagram when Stenger asked her which portion of the body Martinez had used to insert. Vera used the same gingerbread sketches during his interview with G. Doe, and confirmed that G. Doe had pointed to the penis area and the vaginal area as the part that Martinez had used and where he had inserted it, respectively. G. Doe additionally pointed to the breast area of the sketch when describing where Martinez had touched her. Vera stated that apart from some reluctance in describing the male and female body parts used, G. Doe did not appear reluctant to share information about the alleged abuse or hesitate during her interview.

### vi. Sexual Assault Examination

Medical Examiner Mary Ritter, who testified as an expert in child sexual abuse evaluations, stated that she performed a sexual assault forensic examination (SAFE) on G. Doe on June 24, 2019. G. Doe told Ritter that she had pain with sexual contact, as well as pain with urination and bowel movements after her first sexual contact. G. Doe

also told Ritter that she had been touched in her private area by Martinez with his hands, mouth, and private area, and that Martinez had hurt her by touching her in this manner.

Ritter tested G. Doe for sexually transmitted diseases and pregnancy, which were negative. Ritter also examined G. Doe's vaginal and anal areas, which did not show any signs of trauma or injury. Hower, Ritter noted that this was not unusual even when someone complains of pain, because typical injuries to that area in children heal within a week to two weeks. Ritter also stated that due to puberty, a teenage girl's vaginal opening is more durable and tolerant of injuries, and generally heals well, thus making it possible for a lack of injury to the hymen to be consistent with abuse. Ritter observed that G. Doe had a V-shaped edge to her posterior hymenal rim, and noted that while this could have been the result of past trauma, it could also have been a normal irregularity that G. Doe was born with. Ritter did not note anything else unusual during G. Doe's exam.

### c. CSAAS evidence

Dr. Dawn Blacker, a clinical psychologist, testified as an expert on child sexual abuse accommodation syndrome (CSAAS). Dr. Blacker defined CSAAS as a theoretical framework developed in the 1980s to assist therapists working with child victims in dispelling common myths or misconceptions they may have about sexual abuse. She noted that CSAAS was not used to diagnose or give an opinion on whether someone was the victim of sexual abuse.

Dr. Blacker testified that the primary purpose of CSAAS is to better understand why children who are victims of abuse may not act in a way that people would hope for or expect. She also explained different ways that child victims experience sexual abuse and their subsequent ability to disclose, or not disclose the abuse. For example, Dr. Blacker indicated that in many cases, the perpetrator may be someone whom the child knows or has an ongoing relationship with, thus allowing the perpetrator to engage in grooming behaviors that emphasize the special relationship they have with the child and

11

allow the child's parents to trust the perpetrator more.  As a result, the perpetrator is often able to convince the child that disclosing would be negative or harmful, or forms a very close relationship with them prior to the abuse that makes them very important to the child, thus making it even harder for the child to disclose the abuse for fear of negative consequences.  Dr. Blacker also spoke about the five general categories of CSAAS: secrecy, helplessness, entrapment or accommodation, delayed, unconvincing, and conflicted disclosure, and recanting or retraction.  With respect to recanting and retraction, Dr. Blacker identified six factors that could play a role in the victim denying a previous disclosure of sexual abuse, which included, among other things, if the perpetrator is the child's primary caregiver, an unsupportive non-offending caregiver or family, and feelings of responsibility or guilt.

Dr. Blacker testified that she was not familiar with the facts of this case or any of the parties related to the case, and was not offering an opinion as to whether any of the victims had been sexually abused.

### d.  Uncharged Sexual Conduct[8]

#### i.  Testimony of K. Doe

K. Doe testified that she met Martinez when she was 17 years old and began a romantic, sexual relationship with him shortly after, which lasted approximately two and a half years.  K. Doe and Martinez began living together when K. Doe was 18, and subsequently had a child together, who was born when K. Doe was 19.  While K. Doe was pregnant, G. Doe moved in with them, and they lived together for approximately one and a half years.

---

[8] Prior to trial, the trial court granted the People's motion in limine to present evidence of Martinez's uncharged sexual conduct pursuant to Evidence Code section 1108, which provides, in pertinent part, that in a criminal action involving allegations of a sexual offense, evidence that the defendant committed a prior sexual offense or offenses is not inadmissible under the general rules regarding the inadmissibility of character evidence.  (Evid. Code, § 1108, subd. (a).)

12

K. Doe described G. Doe's and Martinez's relationship as "fine." She did not observe Martinez physically harm G. Doe or observe any inappropriate sexual contact between them. K. Doe and Martinez broke up in January 2019, and K. Doe did not see G. Doe afterwards.

### ii. Testimony of A. Doe

A. Doe, Martinez's and D. Doe's cousin, testified that she and Martinez were very close and saw each other regularly while she was growing up. Martinez was approximately 10 years older than A. Doe, and she viewed him as a "big brother." When A. Doe was approximately 13 or 14 years old, Martinez would often pick her up from school, and she started skipping school to hang out with him. Martinez would often bring his friends, who were also older than A. Doe, and asked A. Doe to bring some of her peers as well.

Although Martinez initially told A. Doe to bring friends so she was not lonely, he later asked her to bring specific friends for romantic purposes, such as saying that he wanted her (A. Doe's friend) to be his girlfriend, or "liked" A. Doe's friend "for" others. A. Doe also noted that Martinez liked girls that appeared older and bigger in stature.

About one year after Martinez and A. Doe had been hanging out regularly, Martinez asked A. Doe to invite her friend M. Doe over because he thought M. Doe was "really pretty and tall." Martinez then picked up A. Doe and M. Doe from school, and took them to a hotel, where they met one of Martinez's friends. A. Doe began talking to Martinez's friend, and left M. Doe and Martinez alone in the hotel room together.

When A. Doe was 14 years old, Martinez picked her up from school and took her to a hotel in San Jose. A. Doe had not been able to bring one of her friends with her that day. After they reached the hotel, Martinez told her he was going to take a shower. A. Doe began to feel something was "off," as though Martinez was disappointed she had not brought anyone and therefore wanted something from her. Martinez left the door open while showering, which A. Doe did not find normal and saw as a "red flag." Martinez

13

asked A. Doe to bring him a towel, which she refused; he then came out of the bathroom with only a towel wrapped around his waist and asked her to lay down on the bed with him while they waited for some friends. While A. Doe initially refused to lie down, Martinez told her she was "exaggerating," so she laid down next to him. Martinez kept trying to get A. Doe to drink alcohol to help her relax, which A. Doe found odd as Martinez had previously warned her not to drink or go out with boys. Martinez then told A. Doe to move closer to him, and put his left arm around her head, then put his hand in the middle of her chest. When A. Doe pushed his hand down away from her chest, Martinez grabbed her right hand, told her he wanted her to touch something, and placed her hand on the towel over his penis. A. Doe tried to pull her hand away, but Martinez said "no" and tried to keep her hand on top of his penis. A. Doe then sat up and moved to the edge of the bed, and told Martinez she wanted to go home. Martinez again told her that she was exaggerating, and asked her to relax, lie down, and drink. A. Doe refused and told him to take her back to school, or she would walk back by herself.

Martinez then took A. Doe back to school, but seemed upset with her. When he dropped her off, he told her "don't need to remind you nothing happened. You're just being exaggerated,' " which she took to mean that she should not say anything because no one would believe her. After this incident, A. Doe stopped being alone with Martinez or cutting school to meet him. She did not tell anyone about what had happened at the time.

A. Doe noted that Martinez was overprotective of the female cousins in their family, and often told them not to have boyfriends because he would "fuck them up." She also saw him acting inappropriately with her cousin, who was the same age as A. Doe, including hugging the cousin around the waist, sitting her on his lap, and disappearing with her for hours at gatherings. A. Doe finally told her boyfriend about the incident a few months prior to trial. She also told D. Doe about the incident after

14

observing the family pressure and alienation D. Doe was facing from disclosing that Martinez had inappropriately touched her.

### iii. Testimony of M. Doe

M. Doe testified that she was introduced to Martinez by her school friend, A. Doe, when she was approximately 13 years old. According to M. Doe, A. Doe told her to cut school and walk to her house, where Martinez, A. Doe's older cousin, would pick them up and take them to get tattoos. Martinez and a friend came and picked them up from A. Doe's home, then drove to a liquor store to buy beer for A. Doe and M. Doe to drink so the tattoos would not hurt. Martinez then drove to a Motel 6, and the group went inside. Martinez and his friend started drinking, then gave M. Doe a large beer and told her to "chug" it so that her tattoo would not hurt. When M. Doe asked why they had gone to the motel, Martinez told her it was just to hang out and drink before getting the tattoos— however, M. Doe felt very uncomfortable and unsafe.

While M. Doe was drinking the beer, Martinez told his friend to go get snacks; A. Doe went with him, leaving Martinez and M. Doe alone in the room. M. Doe finished approximately half the beer and began to feel warm—however, since she had never had alcohol before, she did not realize she was possibly drunk or "buzzing." Martinez, who was lying on the bed, kept asking M. Doe to come on the bed with him, to which M. Doe replied she would not. At one point, Martinez got up from the bed and began pulling her arm, but because M. Doe was taller, she felt strong enough to pull back and tell him no. M. Doe told Martinez "no" repeatedly, said that she was a virgin and did not want to do anything, and that she would not want her first time to be with Martinez. Martinez kept trying to pull her towards the bed, and M. Doe eventually ended up on the bed with Martinez on top of her. Martinez and M. Doe were "kind of wrestling" on the bed, as Martinez tried to pin her down with his hands and began kissing her on her face and mouth while telling her to relax. Because M. Doe was bigger than Martinez, she finally was able to kick him off her, then ran to the room door and opened it to leave.

15

Once M. Doe opened the door, Martinez told her not to leave and that A. Doe would be coming back soon so they could go get tattoos. While M. Doe did not feel safe, she got back in the car with A. Doe, Martinez's friend, and Martinez, then drove to the tattoo shop. M. Doe did not tell A. Doe what happened in the motel room at that time. After they reached the tattoo shop, M. Doe got a tattoo, which Martinez signed a waiver for because she was a minor, and Martinez took her home.

After the incident, M. Doe stopped talking to A. Doe, as she felt A. Doe had put her in a bad position and was not a real friend. M. Doe never saw Martinez again, but did not tell anyone about the incident until the trial because she wanted to "erase it"; however, she was able to remember most of the details because it was a traumatic experience.

### 2. Defense's Case

Martinez presented five witnesses to testify on his behalf regarding his character. C.T., who was 23 years old at the time of trial, testified that she had known Martinez all her life and he had been a family friend since before she was born. In 2014, when C.T. was 14, Martinez lived with C.T.'s family, which included C.T.'s parents, C.T., C.T.'s younger sister, and C.T.'s younger brother. In C.T.'s opinion, Martinez was very respectful towards women and teenage girls, and acted appropriately around them. C.T. never observed Martinez being "creepy" towards women or girls or demonstrate an unnatural interest in young girls. C.T. was aware of the allegations in the case, but noted that this did not change her opinion of Martinez. C.T. also was familiar with D. Doe and considered her to be a dishonest person, an opinion also held by others in the same community.

P.R. testified that she met Martinez through his aunt C.R., and often spent time with Martinez and his family for special occasions and events. P.R. also observed Martinez and G. Doe interacting with one another while they were working in their clothing business. P.R. never observed any inappropriate interactions between Martinez

16

and any women or young girls, and described Martinez as very respectful and "proper." P.R. became aware of G. Doe's allegations against Martinez because P.R. accompanied C.R. and G. Doe to the sexual assault examination, and watched C.R.'s son while C.R. and G. Doe were in the examination room. P.R. testified that she asked G. Doe at that time if Martinez had done anything to her, and G. Doe shook her head to say "no." P.R. had also observed Martinez interact with D. Doe on several occasions, and did not observe anything unusual or inappropriate.

A.H., Martinez's cousin, testified that she had a close relationship with Martinez and spent time with him often over summer breaks and vacations. A.H. had never observed Martinez behaving inappropriately towards young women or girls or engaging in inappropriate sexual contact. A.H. had also observed Martinez interact with G. Doe, and while she described Martinez as "strict," she never observed Martinez hit G. Doe or interact with G. Doe in a concerning manner. A.H. had also observed D. Doe interact with Martinez on several occasions and did not see anything unusual, or any changes in D. Doe's behavior towards Martinez. A. H. was aware of the allegations in the case, and stated that this did not change her opinion of Martinez as respectful to women and children with no unnatural sexual interest in young girls.

E.G., Martinez's aunt testified that G. Doe had lived with her briefly in Las Vegas for approximately a year when she was nine or 10 years old because she was becoming "very rebellious" and Martinez was having trouble taking care of her. E.G. had observed G. Doe and Martinez interact with one another and did not observe anything unusual about their relationship. E.G. had also observed D. Doe and Martinez interact with one another on numerous occasions at family events, and did not observe anything unusual or abnormal, or observe D. Doe avoiding Martinez.

R.R., Martinez's cousin, testified that from her observations of G. Doe, she appeared to be very rebellious. R.R. had observed Martinez around women and young children, including D. Doe, and never saw him treating them or touching them

17

inappropriately. R.R. also did not see any unusual interactions between D. Doe and Martinez or notice D. Doe avoiding him at any family events or functions.

### 3. Prosecution's Rebuttal Witness

After the defense rested, the prosecution presented rebuttal testimony from E.R., Martinez's cousin and A. Doe's younger sister. E.R. viewed Martinez as an older brother and frequently interacted with him at family events while growing up. E.R. testified that starting when she was approximately 10 years old, Martinez would bite her on the cheek whenever she greeted him at family events, which made her feel uncomfortable. After E.R. told her father about Martinez's behavior, her father told Martinez to stop. However, Martinez only stopped biting her when her father was around, but continued to bite her when her father was not present, even after she asked him to stop. Martinez also exhibited controlling and jealous behavior towards E.R. by telling her she couldn't have a boyfriend, making her boyfriend uncomfortable when she introduced him to Martinez, and getting angry at her when he saw her hugging and kissing a boy when she was young.

E.R. additionally observed Martinez acting inappropriately with her cousin, A.H., including A.H. sitting on his lap frequently and him grabbing A.H.'s thigh. A.H. and Martinez would also leave the room together and come back in adjusting their clothing.

E.R., who was also D. Doe's cousin, stated that D. Doe and Martinez had a close relationship while D. Doe was younger. However, when D. Doe was approximately 13 to 14 years old, E.R. observed a change in the relationship where D. Doe no longer wanted to go anywhere with Martinez, and would caution E.R. against going with Martinez. Around the same time, D. Doe became very antisocial and started self-harming. E.R. opined that D. Doe was an honest person and had not lied to her before.

## II. DISCUSSION

### A. Instructional Error

Martinez claims that the trial court erred in instructing the jury with CALCRIM No. 318 regarding witness statements made prior to trial. Martinez argues that the

18

instruction prejudicially violated his right to due process and a fair trial by improperly reducing the prosecution's burden of proof and shifting the burden to the defense to prove that the prior statements were not true.

### 1. Relevant Procedural Background

As set forth previously, after G. Doe initially disclosed the alleged abuse in June 2019 to C.R., she made statements to both Detective Stenger and Detective Vera with details about the abuse, including the number of times it occurred, the locations where the assault took place, and the type of assault. Subsequently, at both the preliminary hearing and at trial, G. Doe testified that she had lied about the abuse for varying reasons. At trial, G. Doe claimed that she had lied about the abuse because she was tired of moving from house to house and wanted to stay permanently with C.R. G. Doe also acknowledged that she had previously testified at the preliminary hearing that she had lied about the abuse because she felt Martinez paid more attention to her little brother than her.

At trial, the People admitted G. Doe's prior interviews with Detectives Stenger and Vera into evidence with no objections from defense counsel. In addition, at the conclusion of the trial, the trial court instructed the jury pursuant to CALCRIM No. 318 as follows: "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways: 1. To evaluate whether the witness's testimony in court is believable, AND 2. As evidence that the information in those earlier statements is true." Defense counsel did not object to the instruction as given.

### 2. Applicable Law and Standard of Review

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged

19

instruction in a way' that violates the Constitution." ' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*Ibid.*)

### 3. No Error in Instructing with CALCRIM No. 318

In making his argument, Martinez acknowledges that "the propriety" of CALCRIM NO. 318 has been previously upheld in *People v. Hudson* (2009) 175 Cal.App.4th 1025 (*Hudson*). However, Martinez challenges the logic of the *Hudson* decision by arguing that CALCRIM No. 318 allows for a permissive inference that the prior statement is true, leading to the "ineluctable conclusion that prior unsworn out-of-court statements are inherently more credible or reliable than in-court testimony sworn under penalty of perjury." Martinez further argues that the instruction impermissibly "remove[s] from the jury's consideration the opportunity to use the evidence of [G. Doe's] prior out-of-court statements as evidence the information in those statements were false."

We find no merit to Martinez's contentions. The California Supreme Court has explicitly approved instructing a jury with CALCRIM No. 318 if the evidence presented includes prior witness statements. (See *People v. Thomas* (2023) 14 Cal.5th 327, 394 (*Thomas*).) In addition, a number of appellate courts, including the court in *Hudson*, have concluded that CALCRIM No. 318 accurately states the law. (See *People v. Golde* (2008) 163 Cal.App.4th 101, 119–120; *Hudson, supra,* 175 Cal.App.4th at p. 1029; *People v. Tuggles (*2009) 179 Cal.App.4th 339, 366.) Martinez does not provide us with any reason to disregard binding precedent from our state Supreme Court that CALCRIM No. 318 is a correct statement of the law. In addition, we find nothing in the language of CALCRIM No. 318 that would cause a reasonable juror to conclude that the out-of-court statements are inherently more reliable or credible, or compel the jury to use the statement in either of the two ways suggested. Indeed, by stating that the jury "may" use

the out-of-court statements, the instruction does not require the jury to credit the earlier statements even while allowing it to do so. (See *People v. Anderson* (1989) 210 Cal.App.3d 414, 427 ["a permissive inference empowers the jury to credit or reject the inference based on its evaluation of the evidence, and therefore does not relieve the People of any burden of establishing guilt beyond a reasonable doubt"].) Moreover, nothing in the language of the instruction creates a presumption of truthfulness or suggests in any way how much weight out-of-court statements deserve in comparison with sworn testimony. Thus, we reject Martinez's argument that CALCRIM No. 318 lessens the prosecution's standard of proof by somehow compelling or encouraging the jury to accept the out-of-court statements as true or more credible than the sworn testimony at trial.

We also reject Martinez's argument that CALCRIM No. 318 prevented the jury from using the evidence of G. Doe's prior out-of-court statements as evidence the information in those statements were false. The California Supreme Court in *Thomas* dealt with a similar argument, and held that the instruction was not improper simply because it informed the jury that "it may consider whether testimony is true … [but] does not also tell the jury it may consider whether the testimony is false." (*Thomas, supra,* 14 Cal.5th at p. 394.) Moreover, the *Thomas* court concluded that when evaluating the jury instructions as a whole, the use of additional instructions, including CALCRIM No. 226 (regarding factors to consider in evaluating the credibility of a witness's testimony), demonstrated there was no reasonable likelihood that the jury had applied CALCRIM No. 318 in an improper manner. (*Thomas, supra,* at p. 394.) The appellate court in *Hudson* reached a similar decision in pointing out that the trial court in that case had instructed the jury with additional instructions, including CALCRIM No. 226 and CALCRIM No. 220 (regarding the prosecution's burden to prove all charges beyond a reasonable doubt). (*Hudson, supra,* 175 Cal.App.4th at p. 1029.) Therefore, the *Hudson* court concluded that "[r]ead as a whole, the instructions did not lessen the prosecution's

21

burden of proof by elevating out-of-court statements to unquestionable reliability." (*Ibid.*)

In the instant case, like *Thomas* and *Hudson,* the trial court similarly instructed the jury with CALCRIM No. 226, which informed the jury it alone was charged with judging the credibility or believability of each witness and that it could believe all, part, or none of any witness's testimony. The instruction additionally told the jury that in making that determination, it could consider, among other matters, prior inconsistent statements. Accordingly, the jury was fully apprised of its job to fairly determine the credibility of any and all statements made by a witness, including a witness's out-of-court statements. The court also instructed the jury with CALCRIM No. 220, which explained the prosecution's burden to prove Martinez guilty beyond a reasonable doubt on all offenses. In addition, as noted by the Attorney General, the trial court instructed the jury with CALCRIM No. 302, which explains the jury's role in deciding what evidence, if any, to believe if there is a conflict. Accordingly, given the binding nature of the decision in *Thomas*, while also viewing the jury instructions together as a whole and applying the presumption that a jury was able to follow all of the court's instructions (see *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1190), we conclude that the trial court's use of CALCRIM No. 318 did not impermissibly lower the prosecution's burden or violate Martinez's due process rights.

## B.     *Sentencing Error*

Martinez argues that the trial court erred in imposing mandatory full consecutive sentences for the offenses in counts 1 through 10 because there was no substantial evidence to support a finding that these offenses occurred on separate occasions. Martinez argues that because G. Doe did not provide any details about when the alleged offenses occurred, including the oral copulation and digital penetration charges, there was no indication that there were sufficient "intervening acts" between each offense that would mandate the imposition of consecutive terms as required under section 667.6,

22

subdivision (d).

### 1. *Applicable Law and Standard of Review*

"When a person is convicted of two or more crimes," California law generally requires a court to determine "whether the terms of imprisonment … shall run concurrently or consecutively." (§ 669, subd. (a).)  Generally, most felony crimes are sentenced pursuant to section 1170.1, which provides that "a court imposing determinate, consecutive sentences for two or more felonies is required to impose an 'aggregate term of imprisonment for all these convictions,' which is the sum of the 'principal term,' the 'subordinate term[s],' and any enhancements."  (*People v. Catarino* (2023) 14 Cal.5th 748, 752, citing § 669, subd. (a) and § 1170.1, subd. (a).)

For certain sex offenses, including oral copulation and sexual penetration, the Penal Code establishes two alternative sentencing frameworks under section 667.6, subdivision (c), and section 667.6, subdivision (d).  Under section 667.6, subdivision (d), if the sentencing court finds that multiple sex offenses carrying determinate terms involved separate victims or were committed against the same victim on separate occasions, "[a] full, separate, and consecutive term shall be imposed for each violation," and the terms "shall not be included in any determination pursuant to Section 1170.1."  (§ 667.6, subd. (d)(1) and (3).)  In determining whether the crime was committed against the same victim on separate occasions, the court "shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon the defendant's actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned the opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."  (§ 667.6, subd. (d)(2).)

We apply a deferential standard of review to the trial court's determination that a defendant's convictions for multiple sex offenses constituted "separate occasions" under

23

section 667.6, subdivision (d). (*People v. Garza* (2003) 107 Cal.App.4th 1081, 1092 (*Garza*).) "Once a trial judge has found under section 667.6, subdivision (d), that a defendant committed offenses on separate occasions, we may reverse only if no reasonable trier of fact could have decided the defendant had a reasonable opportunity for reflection after completing an offense before resuming his assaultive behavior." (*Garza,* at p. 1092.)

### 2. *Sentencing Proceedings*

In the probation department's report prepared for Martinez's sentencing, the department noted that all of Martinez's offenses were violent sex crimes pursuant to Welfare and Institutions Code section 6600, subdivision (b). The department considered counts 1 through 10 as involving separate occasions against the same victim, in which Martinez "had a reasonable opportunity to reflect on his actions and nevertheless resumed sexually assaultive behavior," while count 11 involved a separate victim on a separate occasion. The department opined that full, separate, and consecutive terms were mandatory on all counts pursuant to section 667.6, subdivision (d). Because count 11— the offense against D. Doe—was deemed the base term, the department recommended that Martinez be sentenced to the midterm of seven years on that count. The department further recommended that pursuant to section 667.6, subdivision (d), Martinez was to serve consecutive terms on counts 1 through 10, each of which carried an indeterminate term of 15 years to life, for a total aggregate indeterminate term of 150 years to life. Accordingly, the department recommended a total cumulative sentence of 150 years to life consecutive to a determinate term of seven years.

At sentencing, defense counsel indicated that "count 11… [was] the sole count that the court has discretion," and requested that Martinez be sentenced to the lower term of five years instead of the recommended midterm of seven years, particularly given that his remaining terms were mandatory and his familial relationship with G. Doe, the victim in most of the counts, with respect to the case. Although the People objected to

imposition of the mitigated term, the court stated that: "frankly, given the mandatory sentences on the remaining counts, that is going to result in the 150-year sentence, that variation in a mitigated term versus a midterm is miniscule. And I don't see that it accomplishes any of the objectives of sentencing in terms of rehabilitation, punishment, deterrence in a two-year variance from a five-year to a seven-year. I will impose the mitigated term on count 11." Defense counsel did not request any further reductions to the recommended sentence or object to imposition of the full consecutive indeterminate terms on counts 1 through 10. The trial court accordingly adopted the recommended sentence from probation as to counts 1 through 10, and sentenced Martinez to a total cumulative sentence of 150 years to life on counts 1 through 10, with a consecutive determinate term of five years on count 11.

### 3. The Record Does Not Reflect The Trial Court Committed Sentencing Error In Imposing Mandatory Consecutive Terms For Counts 1 Through 10

As a threshold matter, the Attorney General argues that because Martinez's counsel failed to object to the trial court's imposition of full consecutive sentences on counts 1 through 10, and did not request that the trial court make factual findings to support its sentence, Martinez has forfeited such a claim on appeal. As Martinez chose not to file a reply brief, he did not respond to this, or any other point raised in the Attorney General's responsive brief.

"A party in a criminal case may not, on appeal, raise 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' if the party did not object to the sentence at trial." (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751, citing *People v. Scott* (1994) 9 Cal.4th 331, 353 (*Scott*).) "Included in this category are . . . cases in which the court purportedly erred because it . . . failed to state any reasons." (*Scott, supra,* at p. 353.) While we recognize section 667.6, subdivision (d) is "a legislatively mandated sentencing scheme" where full, separate, consecutive sentencing is mandatory under the circumstances therein specified (*People v.*

25

*Jones* (1988) 46 Cal.3d 585, 595), the trial court still retains discretion under that subdivision in determining whether the crimes occurred on separate occasions. Because Martinez challenges the trial court's failure to state any reasons to support this discretionary determination, we apply the forfeiture rule under *Scott*. (See also *In re Sheena K.* (2007) 40 Cal.4th 875, 880 ["Ordinarily, a criminal defendant who does not challenge an assertedly erroneous ruling of the trial court in that court has forfeited his or her right to raise the claim on appeal"].)

Here, we acknowledge that the trial court did not provide any factual explanation for its decision to impose full, separate, and consecutive sentences on counts 1 through 10 pursuant to section 667.6, subdivision (d). However, when imposition of consecutive sentences is mandatory under that section, the trial court is not required to make a statement of its reasons. (See *People v. Craft* (1986) 41 Cal.3d 554, 559 ["When the court sentences under subdivision (d), it need not give a statement of reasons"], superseded by statute on another ground as stated in *People v. Jones* (2001) 25 Cal.4th 98, 112; *People v. Smith* (1984) 155 Cal.App.3d 539, 543 (*Smith*) ["Where the court sentences under that subdivision, it is not required to state reasons for imposing a full consecutive sentence"].) The trial court also stated on more than one occasion that it intended to impose such a sentence. Defense counsel did not object, and appeared to concede that such a sentence was appropriate by stating that count 11 was the "sole count" where the trial court could exercise sentencing discretion.

However, assuming arguendo that Martinez has not forfeited his sentencing claim, we find there was substantial evidence demonstrating that the offenses in counts 1 through 10 each took place on separate, distinct occasions such that Martinez had a reasonable opportunity to reflect on his actions prior to engaging in further acts of abuse. The jury's guilty verdict on all 10 counts involving G. Doe, particularly after she recanted the allegations at trial, reflected that the jury believed G. Doe's out-of-court disclosures regarding the abuse. In her out-of-court statements, G. Doe told both detectives that

26

Martinez had sexually assaulted her by inserting his "private part" into her "private part" on multiple different occasions, including five times at K. Doe's home, at least five times at the Milpitas hotel and approximately six or seven times at the Gilroy hotel. G. Doe also told Detective Vera that Martinez had used his fingers to penetrate her on more than one occasion and had licked her vagina at both hotels, which indicated that these assaults had taken place on separate occasions. Based on this description, there was substantial evidence to conclude that there was a break between each occasion where Martinez had a reasonable opportunity to reflect before engaging in further sexually assaultive behavior within the meaning of section 667.6, subdivision (d).

In addition, the trial court noted prior to imposing its sentence that "the jury heard everything that everybody presented here. They have reached their verdict. I think their verdict is supported by the evidence. It's been presented before all of you and for the public. The record will speak for itself. Very serious allegations. The proof was presented. The jury heard it. Counsel argued it. The decision of the jury has to be respected." We find that such statements reflected the trial court's conclusion that: (1) Martinez qualified "as 'precisely the type of offender from whom society seeks protection by the use of recidivist statutes' " (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 570); and (2) its final sentencing decision was based on the severity of the allegations and evidence presented of Martinez's multiple, separate assaults against G. Doe. Finally, as noted above, while there was no affirmative duty for the trial court to give a statement of reasons under section 667.6, subdivision (d) for imposing consecutive sentences (see *Smith, supra,* 155 Cal.App.3d at p. 543), there is also nothing in the record which indicates the trial court misunderstood or misapplied the law under that sentencing

27

scheme. We therefore conclude that the trial court properly imposed consecutive terms on counts 1 through 10 pursuant to section 667.6, subdivision (d).[9]

## C.    *Application of Credits*

Martinez finally contends that the trial court erred in improperly applying his presentence credits to count 11 only, instead of applying his credits to all counts. Martinez claims that such a limitation was incorrect because consecutive sentences form a single aggregate term, thus requiring credits to apply throughout the term. We find no merit to Martinez's claim.

As noted above, the trial court awarded Martinez 1,901 days of actual credit and 285 days of local conduct credit pursuant to section 2933.1[10], which were applied to count 11 only. Pursuant to section 669, subdivision (a), when a defendant is committed to prison on a life sentence that is ordered to run consecutive to a determinate sentence, the determinate sentence is to be served first. (See *People v. Rodriguez* (2012) 207 Cal.App.4th 204, 211 ["When the defendant is sentenced to determinate and indeterminate terms, the determinate term is served first"].) Moreover, as the Attorney General correctly notes, section 2900.5 provides that "[f]or the purposes of this section, credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted. Credit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed." (§ 2900.5, subd. (b).) Accordingly, since the only determinate sentence in Martinez's case was for count 11, and that term was to be served

---

[9] As we are reaching the merits of Martinez's claim without finding forfeiture, we do not address his alternative claim of ineffective assistance of counsel based on counsel's failure to object to the court's final sentence.

[10] This section provides, in relevant part, that any person convicted of a felony offense listed in section 667.5, subdivision (c), shall accrue no more than 15 percent of work time credit. In turn, section 667.5, subdivision (c) identifies several offenses as violent felonies, including rape, oral copulation, and sexual penetration.

first, the trial court appropriately applied Martinez's credits towards that count.[11]  (See *People v. Bruner* (1995) 9 Cal.4th 1178, 1192, fn. 9 [noting that "when consecutive terms are imposed for multiple offenses in a single proceeding, only one of the terms shall receive credit for presentence custody"]; see also *People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1414–1415 [finding that § 2900.5, subd. (b) complied with when "credit was awarded on the consecutive principal term"].)

### III.    DISPOSITION

The judgment is affirmed.

---

[11] We further note that the three cases cited by Martinez in support of his claim all pertain to the calculation of *conduct* credits pursuant to section 2933.1, with no discussion of the application of credits to a sentence consisting of both indeterminate and determinate terms.

_____
                 Wilson, J.


WE CONCUR:




_____
    Grover, Acting P. J.




_____
    Lie, J.



*People v. Martinez*
H052755